United States District Court
Southern District of Texas

**ENTERED**

December 16, 2020

David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| LATEX CONSTRUCTION COMPANY, | § § § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:20-1788 |
| | § | |
| NEXUS GAS TRANSMISSION, LLC, | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Before the Court is Defendant Nexus Gas Transmission, LLC's ("Defendant's") Motion for Partial Summary Judgment on Plaintiff's Claim for Extra Compensation for Hard Trench Plugs and Foreign Line Crossings [Doc. # 27] ("Motion"). Plaintiff Latex Construction Company ("Plaintiff") has timely responded,[1] Defendant has replied,[2] and Plaintiff has filed a sur-reply.[3] The Motion is ripe for decision. Based on the parties' briefing, pertinent matters of record, and relevant legal authorities, the Court **denies** Defendant's Motion.

---

[1] Plaintiff's Response to Defendant's Motion for Partial Summary Judgment [Doc. # 49] ("Plaintiff's Response").

[2] Defendant's Reply in Support of Motion for Partial Summary Judgment on Plaintiff's Claim for Extra Compensation for Hard Trench Plugs and Foreign Line Crossings [Doc. # 50] ("Defendant's Reply").

[3] Plaintiff's Surreply in Response to New Evidence and Argument in Defendant's Reply in Support of its Motion for Partial Summary Judgment [Doc. # 54] ("Plaintiff's Surreply").

I.    **BACKGROUND**

This case arises out of a contract for construction of a gas transmission pipeline in Ohio.  Defendant, the owner of the Nexus Gas Transmission Pipeline, hired Plaintiff to construct the second of four segments of the pipeline (the "Pipeline").[4]  Plaintiff and Defendant entered into a contract for construction of the Pipeline on February 17, 2016 (the "Contract").[5]  The Contract provided that Plaintiff would receive a "Contract Price," defined as "the total amount paid by Company to Contractor for the Work" in exchange for Plaintiff performing "all of [Plaintiff's] obligations, duties and responsibilities under this Agreement."[6] Exhibit C to the Contract listed all the payments Defendant would make to Plaintiff under the Contract, and the parties agreed that the payments listed in Exhibit C would be all the compensation Plaintiff was entitled to receive, unless the scope of Plaintiff's work was modified through a Change Directive or a Change Order.[7]

---

[4]    Construction Agreement 15-7002: Nexus Gas Transmission Project [Docs. # 27-1, # 28-30] ("Contract"); Declaration of David Williams [Doc. # 49-6] ("Williams Decl."), ¶ 4.

[5]    *Id.*

[6]    Contract § 1.1.

[7]    *Id.* §§ 13.7, 7.1; Exhibit C to Construction Agreement 15-7002: Nexus Gas Transmission Project [Doc. # 28] ("Exhibit C").

Exhibit C provided for different types of compensation: Primary Compensation, a lump sum base payment which "reimburse[d] [Plaintiff] fully to complete the Work," and "Unit Price Extra Work" compensation, which compensated Plaintiff on a per-unit basis for any work not included in the Primary Compensation.[8] Exhibit C listed the unit prices at which Plaintiff would be paid for 35 different items or tasks that might be necessary for construction but were not included in the Primary Compensation.[9]   The unit prices included all labor, materials, and equipment needed to perform the additional work.[10]

The Contract anticipated that construction of the Pipeline would require a number of hard trench plugs and foreign line crossings.  Hard trench plugs are filled portions of the pipeline ditch that allow landowners and livestock to cross the ditch during construction.[11]   Foreign line crossings are preexisting pipes encountered while digging the pipeline ditch.[12]   Hard trench plugs and foreign line crossings are common parts of pipeline construction and require line breaks in the construction

---

[8]     Exhibit C § 1.

[9]     *Id.* § 2.

[10]    *Id.*

[11]    *A Practical Guide for Pipeline Construction Inspectors*, CEPA Foundation, (March 2016) [Doc. # 42-2] ("CEPA Guide"), p. 68.

[12]    *Id.*

process and additional welding work.[13]  The Primary Compensation due to Plaintiff included payment for 96 hard trench plugs and 73 foreign line crossings.[14]  Plaintiff claims it is customary for pipeline owners to allow contractors to put hard trench plugs at "natural breaking points" so that the majority of the pipeline can be constructed using automatic welding.[15]  To the extent construction of the Pipeline required more than 96 hard trench plugs or 73 foreign line crossings, Plaintiff would be paid Unit Price Extra Work compensation of $22,500 for each additional hard trench plug and $29,500 for each additional foreign line crossing.[16]

The Contract provided that the per-unit compensation applied to each additional "unknown buried utility within a 50 ft. corridor" of the pipeline and charged Plaintiff with responsibility for "surface and subsurface ground and soil conditions on the Site, including all natural and manmade obstructions such as utilities."[17]  The Contract also required Plaintiff to investigate the site and identify

---

[13]     *Id.*

[14]     Exhibit C § 2.28; Contractor Requested Change No. 036R2 [Doc. # 31] ("CRC-036R2"); Contractor Requested Change No. 036R [Doc. # 31-3] ("CRC-036R").

[15]     Williams Decl. ¶ 15.

[16]     Exhibit C §§ 2.18, 2.28; February 13, 2018 Change Order [Doc. # 31-3] ("True-Up Amendment") §§ 2.18, 2.28.

[17]     Exhibit C §§ 2.28, 3.15(c).

"obstacles to construction or other general local conditions that may affect performance of the Work or cost of the Project."[18]

The Contract required that Plaintiff complete construction by a scheduled date and allowed Defendant to hold Plaintiff to this schedule if Plaintiff was delayed for reasons within Plaintiff's control.[19]   The Contract provided that Plaintiff could receive compensation for Defendant's acceleration so long as the cause of the delays were outside Plaintiff's reasonable control.[20]

After the Contract was executed, construction was delayed indefinitely because Defendant had not obtained the required permits.[21]   On February 22, 2017, the parties met to discuss pricing changes due to events that had occurred during the delay.[22]   Defendant memorialized in its notes from that meeting that "[Plaintiff] needs indicator on temporary plugs so not missed during construction in the field" and that Defendant would "provide count on temporary plugs by ROW track to

---

[18]   *Id.* § 3.16(b).

[19]   Contract § 5.4.

[20]   *Id.*

[21]   Williams Decl. ¶ 4.

[22]   *Id.* ¶ 5.

Contractor for purposes of pricing."[23]  Later that day, Defendant provided Plaintiff with a list showing that 61 hard trench plugs would be required.[24]

Over the course of the next year, Plaintiff and Defendant exchanged pricing and scheduling estimates while Defendant waited to receive the necessary permits.[25] In June and September 2017, Defendant provided Plaintiff with Construction Line Lists ("CLLs"), which identified special concerns for each landowner over which the Pipeline was to cross.[26]  The June 2017 CLL indicated that a total of 176 hard trench plugs would be needed for the Pipeline.[27]  The September 2017 CLL indicated that 207 hard trench plugs would be needed.[28]

Work began on the project in February of 2018.[29]  On February 13, 2018, Plaintiff and Defendant executed a "True-Up Amendment" to account for cost and

---

[23]     *Id.*; February 22, 2017 Meeting Notes [Doc. # 49-2].

[24]     February 22, 2017 Email from Jolene Packard to Chip Prosser and Shawn Pomerleau [Doc. # 49-2]; List of Temporary Crossings as of February 22, 2017 [Doc. # 49-2]; Williams Decl. ¶ 5.

[25]     Williams Decl. ¶¶ 4–6.

[26]     June 6, 2017 Construction Line List [Docs. # 32-35] ("June 2017 CLL"); September 6, 2017 Construction Line List [Docs. # 36-41] ("September 2017 CLL").

[27]     June 2017 CLL.

[28]     Sept. 2017 CLL.

[29]     Williams Decl. ¶ 13.

schedule adjustments since the Contract was executed approximately two years earlier.[30]  The True-Up Amendment "resolved between [Defendant] and [Plaintiff]" "[a]ll assumptions, clarifications, and items" through September 20, 2017.[31]  In executing the True-Up Amendment, Plaintiff "waive[d] any claim that it may have for any Adjustment in connection with such assumptions, clarifications, and items," but reserved "the right to seek claims of Adjustment as a result of any material document changes made after September 20, 2017."[32]  The True-Up Amendment expressly stated that construction would require 73 foreign line crossings, but was silent with respect to the number of hard trench plugs necessary for the project.[33]

At the time Plaintiff agreed to the True-Up Amendment, Plaintiff based its pricing on the list of 61 hard trench plugs provided by Defendant in February 2017, and not on the increased numbers of hard trench plugs called for by the June 2017 CLL and September 2017 CLL.[34]  Plaintiff stated that although it "ha[d] not revised the quantity of crossings based on information provided in the new construction line list[s]" it "still expect[ed] compensation per the applicable unit item rate . . . set forth

---

[30]     *See* True-Up Amendment.

[31]     *Id.* at 1.

[32]     *Id.*

[33]     *Id.* § 2.28; Williams Decl. ¶ 7.

[34]     Williams Decl. ¶ 8.

in the contract for additional crossings encountered that are over the 61 [hard trench plugs] identified and provided in the email from 2-22-17."[35]   The True-Up Amendment replaced the original Exhibit C to the Contract with an updated Exhibit C.[36]   The updated Exhibit C did not modify the per-unit price for additional hard trench plugs or foreign line crossings.[37]

 After construction began, Defendant took the position that it would not grant any time extensions of the project's completion date for any reason.[38]   Defendant also told Plaintiff that it could not submit any schedule showing completion dates later than planned and demanded that Plaintiff do whatever was necessary to meet

---

[35] CDT # 4 Document Update 2-22-18 [Doc. # 49-2] at 2.  S*ee also* February 22, 2017 Email from Jolene Packard to Chip Prosser *et al.* [Doc. # 49-2].

[36] True-Up Amendment at 1.

[37] *Compare id.* §§ 2.18, 2.28 *with* Exhibit C §§ 2.18, 2.28.

[38] Williams Decl. ¶ 13; September 25, 2018 Letter from Dave Williams to Leo Feist [Doc. # 49-3] ("Your letter states that [Plaintiff] 'at no time' has requested time extensions for the schedule.  That is not correct.  [Plaintiff] has repeatedly notified [Defendant], both verbally and in writing, of grounds for extending the schedule for the Project.  [Defendant] has on many occasions acknowledged that [Plaintiff] is entitled to additional compensation for delaying events."); October 25, 2018 Letter from Dave Williams to Leo Feist [Doc. # 49-3] ("your letter states that Substantial Completion will shift two weeks to match the shift of Mechanical Completion. Extending these milestones now, after [Plaintiff] has achieved Substantial Completion, does not change the fact that [Defendant] has accelerated [Plaintiff's] work on the Project.  Until your letter, [Defendant] had not granted any time extensions to [Plaintiff] despite the numerous changes and delays on this project, and in fact [Defendant] had made it expressly clear to [Plaintiff] that it would not consider any time extensions under any circumstances.").

the planned completion dates.[39]  Plaintiff also claims that after construction began Defendant took the position that Plaintiff could not adjust the locations of the hard trench plugs to put them in natural breaking points, as was customary practice on similar projects.[40]

On April 25, 2018, the parties participated in a teleconference regarding construction of the Pipeline.[41]  During that conference, Defendant indicated that 129 hard trench plugs would be required to complete the project.[42]

On May 7, 2018, Defendant provided Plaintiff with an updated CLL indicating that 210 hard trench plugs would be needed.[43]  Plaintiff submitted Contractor Requested Change No. 36 ("CRC-36") on May 9, 2018 and a revised version of the Requested Change ("CRC-036R") on May 14, 2018 seeking extra compensation of $2,565,000, or $22,500 for each of the 114 hard trench plugs in excess of the 96 hard trench plugs included in the Primary Compensation.[44]  Plaintiff stated in the Change Request that "[s]hould the total [number of hard trench plugs]

---

[39]     Williams Decl. ¶ 13.

[40]     *Id.* ¶ 15.

[41]     April 27, 2018 Email from Freddie Case to Breena Reed [Doc. # 49-3]; Williams Decl. ¶ 9.

[42]     *Id.*

[43]     *See* CRC-036R.

[44]     Contractor Requested Change No. 036R [Doc. # 31-3] ("CRC-036"); CRC-036R.

exceed 210 then each additional Trench Plug will be at the applicable unit item rate."[45]  Plaintiff claims that at that point it "did not know that the additional hard trench plugs would become a critical path item."[46]  Defendant denied Plaintiff's change requests as unnecessary, explaining that a change order was not needed because Plaintiff was already contractually entitled to $22,500 for each hard trench plug in excess of 96.[47]

Plaintiff claims that at that time, it had not yet suffered the costs and delays caused by the additional hard trench plugs and foreign line crossings and did not anticipate that the extra work would significantly interfere with construction.[48]  The unit price for additional hard trench plugs had been based only on the cost of labor to install the plugs as incidental items of work, and not as a defining feature of the project.[49]  Plaintiff constructed the majority of the additional hard trench plugs

---

[45]     CRC-036R.

[46]     Williams Decl. ¶ 10.

[47]     May 4, 2018 Letter from Leo Feist to Dave Williams re: Contractor Requested Change No. 036R [Doc. # 42-1] ("CRC-036R Denial") ("[Defendant] agrees to compensate [Plaintiff] per Exhibit C; 2.18 Additional Hard Trench Plug for each location exceeding ninety-six (96) as encountered during the progression of the Work.").

[48]     Williams Decl. ¶¶ 10, 17.

[49]     *Id.* ¶ 11.

during July and August 2018.[50]  Plaintiff claims that the number and fixed locations of the additional hard trench plugs prevented it from using automatic welding, and by August 2018 the additional plugs had become a "critical path delay" to completion of the Pipeline.[51]

On August 28, 2018, Plaintiff submitted a schedule indicating that work would not be complete until October 4, 2018.[52]  After receiving Plaintiff's schedule, Defendant invoked Contract Section 5.4, which allowed Defendant to "direct [Plaintiff] to accelerate the Work without an increase to the Contract Price, if [Plaintiff] has shown a delay of the milestone dates included in the Project Schedule . . . provided such delays are not a result of [Defendant's] actions or other events outside of [Plaintiff's] reasonable control."[53]  On September 4, 2018, Plaintiff responded to Defendant's August 31 letter and listed events and contract changes that caused the delays.[54]  On September 17, 2018, Defendant responded to Plaintiff's September 4, 2018 letter, reiterating that Defendant was invoking Section 5.4 and

---

[50]    *Id.*; CRC-036R2 at 11-13.

[51]    Williams Decl. ¶¶ 14-17.

[52]    August 31, 2018 Letter from Leo Feist to Dave Williams [Doc. # 49-3]; Williams Decl. ¶ 18.

[53]    *Id.*; *see* Contract § 5.4.

[54]    *See* September 17, 2018 Letter from Leo Feist to Dave Williams [Doc. # 49-3].

that the events and contract changes that Plaintiff claimed had caused the delays had been known by Plaintiff for months.[55]   In response to Defendant's demand that Plaintiff complete construction on the original schedule, Plaintiff devoted all of its resources to completing the project on time.[56]

Plaintiff achieved mechanical completion of the Pipeline on September 13, 2018, 13 days later than called for by the Contract, and substantial completion on October 15, 2018, as required by the Contract.[57]   On November 29, 2018, Plaintiff submitted Contractor Requested Change No. 102 ("CRC-102"), seeking over $30 million in additional labor costs incurred because Defendant refused to grant Plaintiff any time extensions.[58]   Defendant denied CRC-102 on February 1, 2019, writing that the Plaintiff's claims "fail[ed] to satisfy the terms and conditions of the [Contract]" and "disregard[ed] contractual requirements associated with requesting either a time or price adjustment."[59]

---

[55]   *Id.*

[56]   Williams Decl. ¶ 19.

[57]   *Id.*

[58]   Contractor Requested Change No. 102 [Doc. # 42-1], at 3 ("CRC-102").

[59]   February 1, 2019 Letter from Mel Johnson to Dave Williams re: Response to Contractor Requested Change No. 102 [Doc. # 42-1], at 1.

Construction of the Pipeline ultimately required 218 hard trench plugs and 113 foreign line crossings.[60]   Plaintiff's President claims "this increase was "unprecedented," that the company "has never seen such an increase in trench plugs on a project," and that such an increase was neither "ordinary [n]or inherent in a project like this one."[61]   Plaintiff invoiced Defendant for the 122 hard trench plugs and 40 foreign line crossings beyond those encompassed in the Primary Compensation at the per-unit prices specified in Exhibit C to the Contract.[62]

On November 4, 2019, Plaintiff submitted CRC-036R2, a revised version of the May 2018 Contractor Requested Change.[63]   Through CRC-036R2, Plaintiff sought additional compensation for the hard trench plugs and foreign line crossings beyond those included in the Primary Compensation.   Plaintiff claimed that the number of trench plugs and Defendant's refusal to allow Plaintiff to adjust the location of the plugs to put them in natural breaking points was a material change to Plaintiff's work.[64]   Plaintiff also asserted that Defendant's refusal to grant time

---

[60]   August 22, 2018 Invoice LAT-1701-55 [Doc. # 31-1], at NEXUS_0007138; October 10, 2018 Invoice LAT-1701-60R [Doc. # 31-1], at NEXUS_0007185.

[61]   Williams Decl. ¶ 12.

[62]   *Id.*

[63]   CRC-036R2.

[64]   Williams Decl. ¶¶ 12, 15.

extensions for completion of the project caused Plaintiff to spend far more on construction than anticipated.[65]  Plaintiff claimed that, as a result of the number and mandatory locations of hard trench plugs and Defendant's refusal to grant any extensions, it was forced to divert crews from their main construction efforts to install hard trench plugs and foreign line crossings.[66]  Plaintiff estimated that these factors added almost $55 million of work.[67]

On December 11, 2019, Defendant denied CRC-036R2, claiming that "[Plaintiff] was compensated for all hard trench plugs and foreign line crossings according to the [Contract]" and that Plaintiff was "not due any additional compensation under the [Contract]."[68]

Plaintiff was ultimately paid a total of $255 million for its work under the Contract, including $3,925,000 for the 122 hard trench plugs and 40 foreign line

---

[65]     *Id.* ¶ 13.

[66]     *Id.* ¶ 14; CRC-036R2 at 9–10, 16–17.

[67]     Williams Decl. ¶ 19; *see also* CRC-036R2 at 10.

[68]     December 11, 2019 Letter from Paul Grosskopf to Dave Williams re: Company Response to Contractor Request for Change 036R2 [Doc. # 42-1] ("CRC-036R2 Denial").

crossings beyond those encompassed in the Primary Compensation at the per-unit prices specified in Exhibit C to the Contract.[69]

Plaintiff sued Defendant in Texas state court on May 15, 2020 for breach of contract.[70]  On May 22, 2020, Defendant removed the case to this Court.[71]  Plaintiff moved to remand the case on June 19, 2020,[72] and the Court denied Plaintiff's Motion to Remand on July 13, 2020.[73]  Defendant moved for partial summary judgment on August 12, 2020, arguing that as a matter of law Plaintiff is not entitled to any additional compensation for hard trench plugs and foreign line crossings.[74]

## II.   **LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure provides for the entry of summary judgment against a plaintiff who fails to make a sufficient showing of the existence of an element essential to their case and on which they will bear the burden at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Curtis v. Anthony,* 710

---

[69]   August 22, 2018 Invoice LAT-1701-55 [Doc. # 31-1]; October 10, 2018 Invoice LAT-1701-60R [Doc. # 31-1]; October 31, 2018 Weekly Meeting Minutes [Doc. # 31-2].

[70]   Plaintiff's Original Petition, filed in the 270th Judicial District Court for Harris County, Case No. 20-29663 [Doc. # 1-2].

[71]   Notice of Removal [Doc. # 1].

[72]   Plaintiff's Motion to Remand and Memorandum of Law in Support [Doc. # 15].

[73]   July 13, 2020 Memorandum and Order [Doc. # 25].

[74]   Defendant's Motion.

F.3d 587, 594 (5th Cir. 2013); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*).   Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(a); *Celotex*, 477 U.S. at 322-23; *Curtis*, 710 F.3d at 594.

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact."   *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 839 (5th Cir. 2012).   The moving party, however, "need not negate the elements of the nonmovant's case."   *Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 505 (5th Cir. 2014) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)).   The moving party may meet its burden by pointing out "the absence of evidence supporting the nonmoving party's case."   *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003) (citing *Celotex*, 477 U.S. at 323; *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial.   *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001)

(internal citation omitted).  "An issue is material if its resolution could affect the outcome of the action."  *Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 435 (5th Cir. 2013).  "A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the court reviews the facts and inferences to be drawn from them in the light most favorable to the nonmoving party.  *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant.  *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "'Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial.'"  *Pioneer Exploration, L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002)); *accord Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case."  *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012) (citation

and internal quotation marks omitted).  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.  *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

The Court may make no credibility determinations or weigh any evidence. *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*, 336 F.3d at 412-13).  The Court is not required, however, to accept the nonmovant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence. *Id.* (citing *Reaves Brokerage*, 336 F.3d at 413); *accord, Little*, 37 F.3d at 1075.

## III.   <u>DISCUSSION</u>

Defendant argues it is entitled to summary judgment on Plaintiff's claims for extra compensation for hard trench plugs and foreign line crossings for two reasons. First, Defendant argues that it complied fully with its obligations under the Contract by paying Plaintiff the per-unit price for hard trench plugs and foreign line crossings beyond those included in the Primary Compensation.  Second, Defendant argues that it did not breach the contract by denying Plaintiff's request for additional compensation because Plaintiff failed to comply with the Contract's change order process.   Plaintiff counters that (1) Defendant cannot rely on specific contract provisions to defeat Plaintiff's claim because Defendant materially breached the Contract; (2) the Contract's unit prices only applied to small changes to the

construction work, not fundamental changes that prevented Plaintiff from using automatic welding; and (3) the Contract's change order provision is not mandatory and therefore does not defeat Plaintiff's claims.  After careful consideration of the parties' arguments and the extensive record, the Court denies summary judgment without prejudice.  Plaintiff has raised genuine questions of material fact that make judgment as a matter of law at this stage in the litigation inappropriate.

### A.   Defendant's Alleged Breach

The Court first addresses the threshold question of whether Defendant breached the Contract and thus cannot enforce the Contract's terms against Plaintiff. Plaintiff claims that Defendant breached the Contract by refusing to grant any time extensions on the project and by fundamentally changing the nature of the contract. Plaintiff claims that as a result, Defendant cannot now require strict compliance with the Contract's terms, including the unit prices and change order process.  Defendant argues that it did not breach the Contract because Plaintiff never submitted a request for an extension and because the Contract allowed for changes to the project.

### 1.   Law Governing Contract Interpretation

The Contract states that it "shall be governed by, construed and enforced in accordance with the laws of the state of Texas."[75]  "The interpretation of a contract—

---

[75]    Contract § 19.9.

including whether the contract is ambiguous—is a question of law." *McLane Foodservice, Inc. v. Table Rock Rests., L.L.C.*, 736 F.3d 375, 377 (5th Cir.2013); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).  "When the terms of a contract are clear and unambiguous, and the facts concerning breach or performance are undisputed or conclusively established, the issue of whether the facts show performance or breach is also decided as a matter of law." *Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 395 (N.D. Tex. 2016) (citing *Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied)).

### a.    An Owner's Breach Excuses Contractor's Further Performance

"It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) (citing *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994)); *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990) ("[A] party to a contract who is [itself] in default cannot maintain a suit for its breach.").

"When an owner breaches a construction contract, it relinquishes its contractual procedural rights concerning change orders and claims for additional costs." *Shintech Inc. v. Grp. Constructors, Inc.*, 688 S.W.2d 144, 151 (Tex. App.—

Houston [14th Dist.] 1985, no writ).[76]   "Whether a party's breach is so material as to render the contract unenforceable is ordinarily a question of fact . . . ."   *STR Constructors, Ltd. v. Newman Tile, Inc.*, 395 S.W.3d 383, 387 (Tex. App.—El Paso 2013, no pet.); *Examination Mgmt. Servs., Inc. v. Kersh Risk Mgmt., Inc.*, 367 S.W.3d 835, 839 (Tex. App.—Dallas 2012, no pet.); *accord Mustang Pipeline*, 134 S.W.3d at 199.

### b.   Changes to the Nature of a Contact Constitute a Breach

While many construction contracts, including the Contract in the case at bar, allow a property owner to make changes, "[t]here is a point, however, at which changes in the contract are to be considered beyond the scope of the contract and inconsistent with the 'changes' section."   *Nat Harrison Assocs., Inc. v. Gulf States Utils. Co.*, 491 F.2d 578, 583 (5th Cir. 1974) (citing *J.D. Hedin Constr. Co. v. United States*, 347 F.2d 235, 257 (Ct. Cl. 1965)); *Bagwell Coatings, Inc. v. Middle South*

---

[76]   *See also Port of Houston Authority of Harris County v. Zachry Constr. Corp.*, 513 S.W.3d 543, 564 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ("breaching owners like the Port are precluded from invoking procedural clauses to bar contractors' claims for damages.") (citing *West v. Triple B. Servs., LLP*, 264 S.W.3d 440, 446–50 (Tex. App.–Houston [14th Dist.] 2008, no pet.)); *Gulf Liquids New River Project, LLC v. Gulsby Engineering, Inc.*, 356 S.W.3d 54, 71 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Because [owner] failed to pay [contractor] under Contracts 1 & 2, it cannot now rely on the procedural provisions of the extra work clauses in those contracts to avoid payment for extra work."); *Baker Marine Corp. v. Weatherby Eng'r Co.*, 710 S.W.2d 690, 696 (Tex. App.—Corpus Christi 1986, no writ) ("the breaching party . . . cannot take advantage of provisions favorable to it contained in the very contract which it was found to have breached.").

*Energy, Inc.*, 797 F.2d 1298 (5th Cir. 1986) (holding that changes to a construction plan that caused subcontractor's work to be substantially delayed was a material breach of contract); *Wunderlich Contracting Co. v. U.S.*, 351 F.2d 956, 965 (Ct. Cl. 1965) ("Defendant cannot be held liable for the exercise of this contractual privilege [to change construction plans] unless it exceeded the permissible limits of its discretion under the Changes article and ordered changes which were cardinal in nature.").

Changes that fundamentally alter the nature of a contract are sometimes referred to as "cardinal changes." *Pellerin Const., Inc. v. Witco Corp.*, 169 F. Supp. 2d 568, 587 (E.D. La. 2001) ("A cardinal change is a 'drastic modification beyond the scope of the contract' that altered the nature of the thing to be constructed.") (quoting *Air–A–Plane Corp. v. United States*, 408 F.2d 1030, 1033 (Ct. Cl. 1969)); *Atlantic Dry Dock Corp. v. United States*, 773 F. Supp. 335, 339 (M.D. Fla. 1991) (a cardinal change is "so profound that it is not redressable under the contract."). "[W]hen an owner or its agent has abused its power [to make changes to a construction contract], the theory of cardinal change allows a contractor in a losing contract to bring an action for material breach of contract, alleging that the ordered changes exceed the parties' reasonable expectations." *Pellerin*, 169 F. Supp. 2d at 587 (citing *L.K. Comstock & Co. v. Becon Constr. Co.*, 932 F. Supp. 906, 937 (E.D. Ky. 1993)). "The cardinal change doctrine is a creature of the body

of law which has arisen in the context of disputes over government contracts," *Atlantic Dry Dock*, 773 F. Supp. at 339, but also applies to private contracts. *Galin Corp. v. MCI Telecomms. Corp.*, No. H–88–4131, 1992 WL 560909, at \*10-14 (S.D. Tex. July 21, 1992) (finding in a private contract dispute that change order "did not constitute a 'cardinal change' which altered the very essence of the contract.").[77]

"[A] determination of the permissive degree of change can only be reached by considering the totality of the change and this requires recourse to its magnitude as well as its quality." *Nat Harrison Assocs.*, 491 F.2d at 583 (quoting *Saddler v. United States*, 287 F.2d 411, 413 (Ct. Cl. 1961)).  The Fifth Circuit has held that a change order is not a cardinal change to the nature of a contractor's work where it does not change to "the general nature of the work" and is also "not a material change to the plans and specifications." *Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 724–25 (5th Cir. 2005).  Texas appellate courts have held that change

---

[77]     *See also L.K. Comstock*, 932 F. Supp. at 937-38 (applying cardinal change rule to private project because of the "essential similarity of public and private construction contracts with regard to the mechanism for unilateral ordering of changes by the party for whom the work is being performed, and concerns about misuse or overuse of that unilateral authority."), *aff'd without opinion*, 73 F.2d 362 (6th Cir. 1995); *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1020 (Nev. 2004) ("Although the cardinal-change doctrine was created as a check on the government's ability to circumvent the competitive-bidding process by ordering drastic changes beyond those contemplated in the contract . . . its underlying premise—that compensation for cause resulting from an abuse of authority under the changes clause should not be limited by the terms of that clause—applies to private contracts that include changes clauses.").

orders creating "proportionally small amounts of extra work" are not material changes, but change orders creating work that is "new and different from that covered by the agreement" are material changes not subject to unit price terms. *See B.F. & C.M. Davis Co. v. W.E. Callaghan Constr. Co.*, 298 S.W. 273, 279–80 (Tex. Comm'n App. 1927).

### 2.   Plaintiff's Contractual Rights to Extension

Plaintiff claims it was entitled to an extension of time to complete performance of work under Sections 3.15, 5.5, and 6.7 of the Contract.  In response, Defendant argues that it did not breach the Contract by denying Plaintiff extensions because Plaintiff never formally gave Defendant notice that it wanted an extension.

Initially, the Court notes that the parties' relationship, contract negotiations, and amendments to the Contract spanned several years and involved thousands of documents.[78]  The parties' arguments and supporting documents regarding whether Plaintiff requested and was entitled to an extension reveal that the record has not been fully developed and genuine questions of material fact remain.  The Declaration of Dave Williams, President of Latex, supports Plaintiff's position that it requested extensions and Defendant took the position that no extensions would be granted under any circumstances.[79]   Yet, other documents reflecting the parties'

---

[78]    Williams Decl. ¶ 6.

[79]    *See id.* ¶ 13.

communications on this issue are not found in the record,[80] and may be highly

relevant to the parties' claims and defenses.[81]   Moreover, discovery is still underway

---

[80]   *See* August 31, 2018 Letter from Leo Feist to Dave Williams [Doc. # 49-3] (sent in response to a weekly progress report submitted on August 28, 2018 showing scheduling delays and referring to an April 18, 2018 meeting at which Defendant claims it expressed scheduling concerns to Plaintiff); September 17, 2018 from Leo Feist to Dave Williams [Doc. # 49-3] (referencing "[Plaintiff's] September 04, 2018 response letter to Company's Notice of Schedule Milestone Deviation."); September 25, 2018 Letter from Dave Williams to Leo Feist [Doc. # 49-3] (referencing a September 8, 2018 letter from Mr. Williams); October 25, 2018 Letter from Dave Williams to Leo Feist [Doc. # 49-3] (referencing an October 17, 2018 letter from Defendant).

[81]   The specific Contract provisions on which Plaintiff relies for the right to an extension contain notice and procedural requirements, limitations, and conditions precedent.   Section 3.15 states that Plaintiff may seek an extension "to the extent such [worksite] conditions materially differ from information furnished by [Defendant] or are of an unusual nature that differ materially from those ordinarily encountered and generally recognized as inherent in work of the same or a similar nature."   Section 3.15 also provides that "[Plaintiff] is solely responsible for surface and subsurface ground and soil conditions on the Site, including all natural and manmade obstructions" and that "[Plaintiff] has an obligation . . . to examine and investigate the Site and its failure to utilize [Good Engineering and Operating Practices] to conduct reasonable inspections of the Site or to review information provided by [Defendant] for issues related to constructing the Facility on the Site in order to discover unusual site conditions shall not serve as a valid reason for delay, requesting an Adjustment, or the issuance of a Change Order."

Section 5.5 states that Plaintiff may seek an extension "for the unexpected or abnormal occurrence of weather."   Section 5.5 required that any extension "be limited to only the duration by which the unfavorable weather actually delayed the Project Schedule."

Section 6.7 states that Plaintiff may seek an extension due to "any event of Force Majeure," defined as "any circumstance that is not within the reasonable control" of Plaintiff that "cannot be prevented, avoided, or removed" that "materially adversely affects the ability of [Plaintiff] to perform its obligations."   Section 6.7 required that Plaintiff give Defendant notice that an event of force majeure had

and no depositions appear to have been taken.  The enforceability of the notice and other contractual procedural requirements, however, are factually intertwined with the issue of whether Defendant's additions to the work Plaintiff was required to perform constituted a fundamental change to the Contract. *See infra.*  While Plaintiff may face significant hurdles to show it was relieved from complying with the Contract's procedural requirements or that it was entitled to, and properly requested, an extension of time to perform the work Defendant ultimately required, it is premature to rule on these issues in isolation.

### 3.    Changes to the Contract

Plaintiff also claims that "[Defendant] breached the Contract by . . . failing to compensate [Plaintiff] for the additional, extra work, and/or changed work arising from [Defendant's] acts, omissions, and directives . . . ."[82]  Defendant argues that it

---

occurred and specify the length of any resulting delay to the project schedule within five days of the event occurring.

Plaintiff represented in the Contract that it had reviewed all of the construction plans, maps, diagrams, and schedules and investigated the Pipeline location and all "other general and local conditions and Applicable Laws that might affect its performance of the Work or the cost thereof." *Id.* § 3.16(b).  Plaintiff agreed that "any failure by it to investigate . . . will not relieve it of any responsibility to successfully perform the Work in accordance with the Project Schedule and the Contract Price." *Id.* § 3.16(e).

[82]    Complaint ¶ 22.

did not fundamentally change the nature of the Contract and that any changes were the result of differing site conditions, circumstances on which Plaintiff bore the risk.

Plaintiff's Primary Compensation included compensation for 96 hard trench plugs and 73 foreign line crossings.[83] The Contract provided that Plaintiff would be paid a flat fee for each foreign line crossing or hard trench plug in excess of those included in the Primary Compensation.[84] Plaintiff was to be paid $29,500 for each additional foreign line crossing and $22,500 for each additional hard trench plug.[85] These unit prices explicitly included all labor, equipment, and welding necessary to install the plug or crossing.[86]

Plaintiff counters that Defendant's extensive changes to both the number of hard trench plugs and foreign line crossings, as well as the locations of those plugs required Plaintiff to use a different method of construction from that originally planned and bid, and thus changed the fundamental nature of the work. Specifically, Plaintiff claims it bargained in the Contract to construct the pipeline using "automatic welding," but the number and placement of additional hard trench plugs

---

[83]   CRC-036R2.

[84]   Exhibit C §§ 2.18, 2.28.

[85]   *Id.*

[86]   *Id.*

and foreign line crossings required Plaintiff to manually weld much of the Pipeline.[87]

Plaintiff has raised a genuine fact issue whether these substantial changes created a

fundamentally different project.

While Plaintiff had notice of the approximate number of additional hard

trench plugs and foreign line crossings before executing the True-Up Amendment,

there are genuine questions about when Plaintiff learned, or was on notice, that some

or many hard trench plugs could not be installed at "natural breaking points," the

degree to which Plaintiff was not able to use automatic welding as a result, and the

portion of the pipeline for which manual welding was required.[88] There is a question

whether constructing a pipeline using automatic welding is materially different in

cost and time required from using manual welding.  As noted above, there is also a

genuine issue whether Plaintiff was put on notice of and agreed to the additional

---

[87]   Response at 8-9.  Automatic welding "means that the project is built in an assembly
       line fashion with a highly automated welding system that sequentially loads each
       piece of pipe, welds it to the prior one, and then moves on to the next piece of pipe."
       Williams Decl. ¶ 11.

[88]   Response at 8; Williams Decl. ¶ 15.  It is noted that Plaintiff must show that
       Defendant's breach occurred prior to any breach by Plaintiff in order for Plaintiff to
       be excused from the Contract's change order and unit pricing terms.  This analysis
       is complicated by the fact that Plaintiff appears to have agreed to Defendant's
       changes to the Contract at various points before and after construction began.
       Plaintiff may also have to show that Defendant's fundamental changes to the
       contract occurred after Plaintiff had agreed to compensation at the unit price rate.
       *See* CRC-036R (stating that "[s]hould the total [number of hard trench plugs] exceed
       210 then each additional Trench Plug will be at the applicable unit item rate.").

requirements. This factually intricate case is mid-way through discovery. Summary judgment at this time on whether Defendant breached the Contract by fundamentally changing its requirements and thus relieving Plaintiff of the need to meet various procedural requirements and receive additional compensation is not warranted.

### B.    Unit Prices

Defendant argues that Plaintiff is not entitled to any additional compensation for hard trench plugs and foreign line crossings as a matter of law because Plaintiff was paid the agreed unit price for each hard trench plug or foreign line crossing beyond those included in the Primary Compensation. As discussed in Section III.A.3, *supra*, the unit price terms may not limit Plaintiff's compensation *if* Defendant's changes fundamentally changed the nature of the work to be performed by Plaintiff under the Contract.[89]   Genuine questions of material fact preclude summary judgment on this point.

---

[89]   Unit price terms such as those in the Contract are enforced by the Fifth Circuit and Texas courts. *See Jackson v. Sam Finley, Inc.*, 366 F.2d 148, 155 (5th Cir. 1966); *City of Houston v. L.J. Fuller*, 311 S.W.2d 285, 289-90 (Tex. Civ. App.—Houston 1958, no writ); *City of Baton Rouge v. Robinson*, 127 F.2d 693, 695 (5th Cir. 1942). However, these courts do not enforce unit prices for work outside the scope of the parties' contract or that which is the result of a change that fundamentally alters the nature of the contract. *Interstate Contracting Corp.*, 407 F.3d at 724–25; *J.D. Hedin Constr. Co.*, 347 F.2d at 257; *B.F. & C.M. Davis Co.*, 298 S.W. at 279–80 (a contractor's duty to perform additional work at a fixed unit price is "limited by the subject-matter of the contract to such proportionally small amounts of extra work as may become necessary" to complete the work).

### C.   <u>Change Order Process</u>

Defendant argues that Plaintiff is not entitled to extra compensation for additional hard trench plugs and foreign line crossings as a matter of law because Plaintiff did not comply with the Contract's change order process.  In response, Plaintiff argues that the change order process was not mandatory and Defendant may not use the change order process to defeat Plaintiff's claim because Defendant breached the Contract.

The Contract provides that Plaintiff could request additional compensation through a Change Directive or Change Order.[90]  Section 6.5(a) states "[Plaintiff] may send [Defendant] a Change Request at any time, seeking a Change, however any such Change Request must be made within five (5) Business Days of an event giving rise to the Change Request."

As discussed in Section III.A.1, *supra*, "[w]hen an owner breaches a construction contract, it relinquishes its contractual procedural rights concerning change orders and claims for additional costs."[91]  If Defendant breached the

---

[90]   Contract §§ 1.1, 7.1.

[91]   *Shintech*, 688 S.W.2d at 151; *Port of Houston Auth.*, 513 S.W.3d at 564 ("breaching owners like the Port are precluded from invoking procedural clauses to bar contractors' claims for damages.") (citing *West*, 264 S.W.3d at 446–50); *Gulf Liquids*, 356 S.W.3d at 71 ("Because [owner] failed to pay [contractor] under Contracts 1 & 2, it cannot now rely on the procedural provisions of the extra work clauses in those contracts to avoid payment for extra work."); *Baker Marine Corp.*,

Contract, it may not invoke the change order process to bar Plaintiff's claims. Because genuine issues of material fact exist regarding whether Defendant breached the Contract, Defendant is not entitled to summary judgment that Plaintiff's claims related to additional hard trench plugs and foreign line crossings are barred by the Contract's change order process.[92]

## IV.   **CONCLUSION**

Defendant has not shown beyond genuine dispute of material fact that it did not breach the Contract by denying Plaintiff schedule extensions or by ordering fundamental or cardinal changes to the Contract.  Plaintiff faces significant hurdles in establishing that Defendant breached the Contract and that Plaintiff did not agree that the Contract's unit pricing would apply to any additional work, but summary judgment on these issues is not appropriate at this early stage.  The issues implicated in Defendant's Motion are fact-intensive, and the documents submitted by the parties in support of their respective positions highlight the need for further discovery and factual development.  It is hereby

---

710 S.W.2d at 696 ("the breaching party . . . cannot take advantage of provisions favorable to it contained in the very contract which it was found to have breached.").

[92]   Because the Court finds that genuine issues of material fact exist regarding whether Defendant breached the Contract and thus may not require strict compliance with the change order process, the Court does not reach Plaintiff's arguments that the change order process was permissive and that Defendant waived strict compliance with the process by accepting untimely change requests.

**ORDERED** that Defendant's Motion for Partial Summary Judgment on Plaintiff's Claim for Extra Compensation for Hard Trench Plugs and Foreign Line Crossings [Doc. # 27] is **DENIED**.

SIGNED at Houston, Texas, this 16th day of **December, 2020**.

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE